# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

## NO. 22-1673
_____

### TERRY PROCTOR,
**Appellant,**

**v.**

### CARLOS DEL TORO, Secretary,
### United States Department of the Navy
### Appellee.

*Appeal from the United States District Court for the District of Maryland*
_____

## <u>APPELLANT'S OPENING BRIEF</u>

NATHANIEL D. JOHNSON (MD No. 14729)
Attorney for Appellant
The Employment Law Firm, LLC
3261 Old Washington Road, Suite 2020
Waldorf, Maryland 20602
301-645-9103
ndjesquire@gmail.com

AUGUST 17, 2022

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**TERRY PROCTOR,**

*Appellant,*

v.

**CARLOS DEL TORO,**
**Secretary,**
**Department of the Navy,**

*Appellee.*

**CASE NO. 22-1673**

## APPELLANT'S OPENING BRIEF -- TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

DISCLOSURE OF CORPORATE AFFILIATIONS . . . . . . . . . . . . . . . . vii

A. JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. STATEMENT OF ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . 2

C. STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    1. Mr. Proctor's Accomplished Career as a GS-11
       Boiler Plant Supervisor I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    2. Mr. Proctor was Discriminated Against When He Applied for
       Promotional Opportunities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

3. After Mr. Proctor Engaged in Protected Activities in January 2019, the Agency Initiated Removal Proceedings Against Him . . . . 6

4. In March 2020, a Year After Issuing the NOPR Without Any Decision and After Mr. Proctor Engaged in Further Protected Activities, DON Demoted Mr. Proctor and Intimidated Him Into Signing the Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . 10

D. SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

E. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

2. The District Court Abused its Discretion in Denying Appellant's Motion for Discovery, Resulting in Manifest Injustice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

3. The District Court Erred in Failing to Find that the Settlement Agreement was Void for Inadequacy of Consideration. . . . . . . . . . 18

4. The District Court Erred in Failing to Find that the Waiver was Not a Knowing and Voluntary Waiver of Mr. Proctor's Claims Under the ADEA and Title VII . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

F. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF COMPLIANCE WITH RULE 32(a). . . . . . . . . . . . . 32

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

ii

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**TERRY PROCTOR,**

*Appellant,*

v.

**CARLOS DEL TORO,**
**Secretary,**
**Department of the Navy,**

*Appellee.*

**CASE NO. 22-1673**

## APPELLANT'S OPENING BRIEF -- TABLE OF AUTHORITIES

**STATUTES:**

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

29 U.S.C. §633a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

29 U.S.C. §626(f)(1)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 27

42 U.S.C. § 2000e-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

42 U.S.C. § 2000e-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

**CASES:**

*Adams v. Trustees of Univ. of N.C.-Wilmington,* 640 F.3d 550
        (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . . 15, 16

iii

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . 16

*Benjamin v. Sparks*, 986 F.3d 332 (4th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . 15

*Bennett v. Coors Brewing Co.*, 189 F.3d 1221 (10th Cir. 1999) . . . . . . . . 26, 27, 30

*Bledsoe v. Palm Bch. Soil & Water Conserv. Dist.*,
   133 F.3d 816 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Bonds v. Leavitt*, 629 F.3d 369 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Cassiday v. Greenhorne & O'Mara, Inc.*,
   63 Fed. App'x. 169 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 30

*Cassiday v. Greenhorne & O'Mara, Inc.*,
   220 F. Supp.2d 481 (D. Md. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 30

*Chaplin v. NationsCredit Corp.*, 307 F.3d 368 (5th Cir. 2002) . . . . . . . . . . . . . . 20

*Cheek v. United Healthcare of Mid-Atlantic, Inc.*,
   378 Md. 139 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Cuchara v. Gal-tronics Corp.*, 129 Fed. App'x. 728 (3d Cir. 2005) . . . . . . . . 27, 30

*Dave & Busters, Inc. v. White Marsh Mall, LLP*,
   616 Fed. App'x. 552 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Dorn v. Gen'l. Motors Corp.*, 131 Fed. App'x. 462 (6th Cir. 2005) . . . . . . . . 27, 30

*Greater Balt. Cntr. For Pregnancy Concerns v. Mayor & Cty. Council of
   Balt.*, 721 F.3d 264 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Griffith v. Kraft Gen'l. Foods, Inc.*, 62 F.3d 368 (11th Cir. 1995) . . . . . . . . . . . 27

*Halperin v. Abacus Tech. Corp.*, 128 F.3d 191 (4th Cir. 1997) . . . . . . . . . . . . . 16

*Haywood v. Locke*, 387 Fed. App'x. 335 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . 18

*Humphries v. CBOCS West, Inc.*, 474 F.3d 387 (7ᵗʰ Cir. 2007) . . . . . . . . . . . . . 18

*Kendall v. Cty. of Chesapeake, Va.*, 174 F.3d 437 (4ᵗʰ Cir. 1999) . . . . . . . . . . . 19

*Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.*,
 456 Md. 272 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Livingston v. Adirondack Beverage Co.*,
 141 F.3d 434 (2ⁿᵈ Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 30

*McCray v. Md. Dep't. of Transp.*, 741 F.3d 480 (4ᵗʰ Cir. 2014) . . . . . . . . . . . 16, 18

*Melanson v. Browning-Ferris Indus., Inc.*, 281 F.3d 272 (1ˢᵗ Cir. 2002) . . 27, 28, 30

*Mereish v. Walker*, 359 F.3d 330 (4ᵗʰ Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*O'Hare v. Global Natural Resources, Inc.*, 898 F.2d 1015 (5ᵗʰ Cir. 1990) . . . . . . . 20

*Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998) . . . . . . . . . . . . . . . . . . . 25

*Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 110 F.3d 431 (7ᵗʰ Cir. 1996) . . . 27

*Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 133 (2000) . . . . . . . . . . . . . 15

*Runyan v. NCR Corp.*, 573 F. Supp. 1454 (S.D. Ohio 1983) . . . . . . . . . . . . . . . . 20

*Smith v. Amedisys, Inc.*, 298 F.3d 434 (5ᵗʰ Cir. 2002) . . . . . . . . . . . . . . . . . . 27, 30

*Staley v. Gruenberg*, 575 Fed. App'x. 153 (4ᵗʰ Cir. 2013) . . . . . . . . . . . . . . . . . . 18

*Tung v. Texaco, Inc.*, 150 F.3d 206 (2ⁿᵈ Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 27, 30

*U.S. v. Kimbell Foods, Inc.*, 440 U.S. 17 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*U.S. Methanol, LLC v. CDI Corp.*, 2002 WL 2752365 (4ᵗʰ Cir. July 14, 2022) . . . 15

*Villa v. CavaMezze Grill, LLC*, 858 F.3d 896 (4ᵗʰ Cir. 2017) . . . . . . . . . . . . . . . . 16

*Warnebold v. Union Pacific R.R. Co.*, 963 F.2d 222 (8th Cir. 1992) . . . . . . . . . . .  27

*Whitehead v. Okla. Gas & Elec.*, 187 F.3d 184 (10th Cir. 1999) . . . . . . . . . . . . . .  27

## **COURT RULES**

Fed. R. App. P. 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Fed. R. App. P. 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. App. P. 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 32

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-1673__     Caption: __Terry L. Proctor v. Thomas W. Harker__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Terry L. Proctor, Jr.__
(name of party/amicus)

_____

who is    __Appellant__    makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2.    Does party/amicus have any parent corporations? ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: Nathaniel Johnson /S/ _____    Date: _____ July 6, 2022 _____

Counsel for: Appellant _____

/iii

- 2 -

Print to PDF for Filing

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**TERRY PROCTOR,**

*Appellant,*

v.

**CARLOS DEL TORO,**
**Secretary,**
**Department of the Navy,**

*Appellee.*

**CASE NO. 22-1673**

## <u>APPELLANT'S OPENING BRIEF</u>

Appellant, Terry Proctor, by and through his undersigned attorney and, pursuant to Fed. R. App. P 28, 30 and 32, submits Appellant's Opening Brief.

## A. <u>JURISDICTIONAL STATEMENT</u>

In his Complaint (ECF 1) [JA 5-19], Mr. Proctor alleged that he had been discriminated against because of his race (African American) and age (date of birth April 6, 1960) and suffered unlawful retaliation for opposing unlawful practices and participating in EEO proceedings, in violation of §§703 and 704 of the Title VII of the Civil Rights Act of 1964 ("Title VII") (42 U.S.C. §§2000e-2 and 3) (Counts I and II) [JA 13-15] and the Age Discrimination in Employment Act of 1967

1

("ADEA") (29 U.S.C. §633a) (Counts III and IV) [JA 15-18].  Mr. Proctor also alleged that he was constructively discharged (Count V).  [JA 18-19].

This Court has jurisdiction over this appeal as of right since it arises from a final order of the United States District Court for the District of Maryland entered on April 26, 2022 (ECF ). [JA 158].  Appellant timely appealed that final order, filing his Notice of Appeal on May 26, 2022 (ECF 37).  [JA 168].  This appeal is from a final order that disposes of all the parties' claims in the District Court, establishing jurisdiction in this Court pursuant to 28 U.S.C. §1291.

## B. <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

1. Whether the District Court erred in granting Del Toro's motion to dismiss where the record, considered in the light most favorable to Proctor, and according him all favorable factual inferences, demonstrated that the Settlement Agreement and Mutual Release ("Settlement Agreement") was not supported by valuable consideration?

2. Whether the District Court erred in granting Del Toro's motion to dismiss where the record, considered in the light most favorable to Proctor, and according him all favorable factual inferences, demonstrated that the waiver of rights contained in the Settlement Agreement was not a knowing and voluntary waiver of Proctor's rights under Title VII and the ADEA?

3.  Whether the District Court abused its discretion and erred in denying Proctor's

motion for discovery where the record demonstrated that, by that action, the

District Court deprived Proctor of the discovery necessary to present facts

essential to justify his opposition to Harker's dispositive motion?

## C. STATEMENT OF THE CASE

### 1. Mr. Proctor's Accomplished Career as a GS-11 Boiler Plant Supervisor I.

From November 1991, until April 30, 2020, when he retired involuntarily, Mr.

Proctor worked in the Public Works Department ("PWD") at the Department of the

Navy's ("DON" or "Agency") Naval Surface Warfare Center, Indian Head ("Indian

Head Facility"), Maryland.  [JA 7, 93].

During his career in the PWD, Mr. Proctor received several promotions and, in

April 2020, was a Boiler Plant Supervisor I, a Grade 11 position.  Throughout his

tenure in the PWD, Mr. Proctor consistently maintained "exceeds expectations" or

"outstanding" performance levels. Mr. Proctor also regularly received cash

performance awards, receiving a $600 award on August 5, 2018 and a $900 award

on April 2, 2017.  Prior to Spring 2019, Mr. Proctor had a spotless disciplinary

history. [JA 7, 93, 101].

The Indian Head Facility is located on a sprawling, rural 3,500-acre peninsula in

and about Indian Head, Maryland.  It includes building numbers 3162 through 3170

and 712, which are widely dispersed throughout the Indian Head Facility. The PWD is charged with supplying utilities and maintaining building services at those buildings. The Indian Head Facility has two campuses, separated by Mattawoman Creek, a large body of water. There are no bridges spanning Mattawoman Creek, connecting the two campuses. [JA 7, 94].

As a Boiler Plant Supervisor I, Mr. Proctor was responsible for ensuring that the physical plant systems in the Indian Head Facility's buildings were functioning during his scheduled 12-hour work shifts. Regularly during his shifts, he was required to make "rounds" involving inspections of the buildings spread throughout the Indian Head Facility. Those rounds would require Mr. Proctor regularly to drive throughout the Indian Head Facility's two campuses. In conducting those rounds, for the facilities across Mattawoman Creek, Mr. Proctor was required to exit the larger campus' main gate and drive on public roads to the other campus, a 15-minute drive. [JA 7-8, 94].

In performing those rounds inspecting the far-flung facilities, Mr. Proctor used his government-assigned vehicle, but also occasionally used his personal vehicles. Mr. Proctor, who regularly performed repairs on other personally-owned vehicles, regularly would drive those vehicles onto the Indian Head Facility, and often would use those vehicles in performing those inspections. [JA 8, 94].

4

During the relevant period, Mr. Proctor's daughter, who did not own a private vehicle, also worked at the Indian Head Facility and regularly would use Mr. Proctor's personally-owned vehicles that Mr. Proctor had driven onto the Indian Head Facility. Mr. Proctor's brother also worked at the Indian Head Facility. Both his daughter and brother had keys and free access to Mr. Proctor's personal vehicles. As a result, Mr. Proctor's personal vehicles also would be moved during the course of the working day, both by Mr. Proctor and his relatives. [JA 8, 94-95].

When Mr. Proctor used either his government-assigned or personal vehicles to perform his inspections throughout the Indian Head Facility, Mr. Proctor never deviated from his professional obligations and did not use those vehicles on a "frolic and detour" from his professional job duties, beyond what was permitted by DON's policies and practices, such as using such vehicles during lunch or other work breaks. [JA 8, 95].

## 2. **Mr. Proctor was Discriminated Against When He Applied for Promotional Opportunities.**

On December 18, 2018, DON posted on the USA Jobs website a vacancy for a Boiler Plant Operator Supervisor, WS-5402-13, a Grade 13 position in the PWD at the Indian Head Facility. [JA 8, 95, 103-04].

Mr. Proctor, who was well-qualified for that position, applied for that vacancy. As his application materials and resume reflected, Mr. Proctor had substantial experience in boiler plant operations and supervising crews. During times that his

supervisor was absent on annual or sick leave, Mr. Proctor actually had performed, without objection or incident, the duties of the Boiler Plant Operator Supervisor position. [JA 8, 95].

On January 4, 2019, Mr. Proctor was informed that he was not selected for that vacancy. The person selected, Thomas Baldwin (Caucasian, under 40 years of age), had no prior experience in boiler plant operations and had a checkered employment history, including, destroying, through negligence, government equipment. Additionally, Baldwin had less experience than Mr. Proctor's unblemished exemplary experience in PWD, especially in boiler plant operations. Mr. Proctor was significantly better qualified for the Boiler Plant Operator Supervisor position than Baldwin, and the other applicants for that position. [JA 9, 95].

After learning of Baldwin's selection for the Boiler Plant Operator Supervisor position, Mr. Proctor, in January 2019, contacted DON's EEO representatives in an effort to file an administrative EEO Complaint. Those representatives refused to process Mr. Proctor's informal EEO Complaint and he was precluded by those EEO representatives from filing a formal complaint regarding Baldwin's selection. [JA 9, 96].

**3.** **After Mr. Proctor Engaged in Protected Activities in January 2019, the Agency Initiated Removal Proceedings Against Him.**

In late January 2019, several weeks after Mr. Proctor had initiated contact with DON's EEO representatives, Gary Kendrick (Caucasian), PWD's Deputy Public

6

Works Officer, met with Mr. Proctor in Tommy Baldwin's office. Kendrick began aggressively interrogating Mr. Proctor about where he was on certain days where he was scheduled to work. Kendrick provided no details, so Mr. Proctor could not provide any cogent, detailed responses. Mr. Proctor also was questioned about events allegedly occurring in mid-November 2018, more than two months earlier. Mr. Proctor told Mr. Kendrick what he recalled to the best of his recollection. Mr. Kendrick did not confront Ms. Proctor with any witness statements or documents describing their observations. [JA 96].

In early March 2019, Baldwin was selected for the Boiler Plant Operator Supervisor position, not because of his skills and experience, but rather, because he had been pre-selected for that position by PWD supervisors. Those supervisors, who are Caucasian, including Mark Murphy and Lieutenant Commander William Moiles, selected Baldwin because of his race and age, despite the fact that Mr. Proctor was substantially better qualified than Baldwin. [JA 9, 96].

After Baldwin's selection, Mr. Proctor continued to perform his job duties professionally and consistently with DON's policies and practices. [JA 9, 96].

On March 25, 2019, several weeks after Ms. Proctor's thwarted attempt to initiate EEO proceedings regarding his non-selection for the Boiler Plant Operator Supervisor position, Mr. Kendrick issued Mr. Proctor a Proposed Removal from Federal Service ("NOPR") (ECF 13-2), ostensibly because Mr. Proctor had violated

DON's time and attendance policies. Mr. Proctor was charged with abandoning his work station to engage in personal activities. DON offered no proof that Mr. Proctor actually had abandoned his duty station or that he was engaging in personal activities during times when he should have been working. The deciding official was Lieutenant Commander William Moiles (Caucasian, substantially younger than Mr. Proctor). [JA 9-10, 96-97].

Other PWD employees, not in Mr. Proctor's protected classifications (race and age), and that had not engaged in activities protected under Title VII and the ADEA, including Thomas Baldwin, Edward Hayden (Caucasian, under 40 years of age), Shawn Butler (Caucasian, under 40 years of age), Kevin Wood (Caucasian, under 40 years of age) and Robert Kraft (Caucasian, under 40 years of age), had actually committed similar or more severe misconduct than Mr. Proctor was alleged to have committed, yet were not subject to disciplinary proceedings, including NOPRs similar to the NOPR that was issued to Mr. Proctor in March 2019. [JA 10, 97].

On April 2, 2019, Mr. Proctor sent Ms. Rebecca Tittle (Caucasian), Director, Labor and Employee Relations, an e-mail requesting the documents relied upon in the NOPR, and posed several questions regarding his non-selection for the Boiler Plant Operator Supervisor position that had been posted on December 18, 2018. In that e-mail, Mr. Proctor queried: "a) who was selected for the position I applied for?; b) what is the pay scale for this position that I applied for?; c) who was selected?; d)

was qualified but not selected, if so I did not receive any correspondence as to being selected or qualified or any information pertaining to me not being selected?" [JA 97, 105].

The next day, Ms. Tittle e-mailed Mr. Proctor, informing him that she would gather the requested materials, but that his questions regarding the selection process were being referred to the Agency's staffing director, Ms. Trina Anderson. [JA 97, 106].

Mr. Proctor, on April 5, 2019, sent an e-mail to Ms. Anderson seeking an acknowledgement of her receipt of the selection questions that he had posed to Ms. Tittle. Ms. Anderson never responded substantively to Mr. Proctor's inquiry. [JA 97-107].

On April 20, 2019, Mr. Proctor sent Ms. Tittle, an e-mail explaining that his shift (D-Shift) was short-staffed, with only two people assigned regularly, Mr. Proctor and Mr. Michael Raleigh (Caucasian). Mr. Proctor explained that, because of that short-staffing, he always was kept busy making rounds to check the physical plants at multiple Indian Head Facility buildings. Mr. Proctor noted that the other shifts (A, B and C) regularly had three workers regularly assigned per shift. [JA 97-98, 108].

Mr. Proctor, who had not violated any Agency policies, on April 25, 2019, submitted his response to the NOPR, in which he vociferously opposed that action,

including disputing, not only the "merits" of the conduct cited in the NOPR, but also demonstrating that the timing of the NOPR violated DON's policies and practices regarding progressive discipline and providing timely notice of alleged violations. In his response, Mr. Proctor explicated the disadvantages that resulted from the Agency's failure to timely place him on notice of the alleged time and attendance violations. He also explained that he owned several vehicles and that he did not consistently drive the same personal vehicle to work each day. Mr. Proctor described that his daughter and brother regularly had access to his personal vehicles and could have taken them on the dates referenced in the NOPR. [JA 10, 98, 109-12].

**4. In March 2020, a Year After Issuing the NOPR Without Any Decision and After Mr. Proctor Engaged in Further Protected Activities, DON Demoted Mr. Proctor and Intimidated Him Into Signing the Settlement Agreement.**

Following Mr. Proctor's April 25, 2019 response to the NOPR, DON took no action on the NOPR. No decision to remove Mr. Proctor from federal service ever was entered by the DON. [JA 10, 98].

On March 12, 2020, Mr. Proctor received notification that his Boiler Plant Supervisor position, WS-5402-11, had been reduced in status and grade, to Boiler Plant Equipment Mechanic, WG-5402-10, a Grade 10 position. That action was taken by Ms. Tittle. No Caucasian and substantially younger comparators, or co-workers that had not engaged in protected activities, experienced similar demotions. Ms. Tittle provided no explanation for the demotion. No reference was made to the

NOPR, which, as of March 12, 2020, had been open for a year, since March 25, 2019, without a decision having been rendered. Mr. Proctor was told that he could accept the demotion or retire. [JA 10, 98-99].

After receiving notification of the demotion described in Ms. Tittle's March 12, 2020 e-mail, Mr. Proctor, on March 20, 2020, met with an EEO counselor to file an informal complaint of discrimination. Mr. Proctor described the action to be taken and told the EEO counselor that he was given the choice of accepting the demotion to the WS-10 level or retire by April 10, 2020. Mr. Proctor informed the EEO counselor about his thwarted efforts to file an EEO Complaint in February 2019. Unlike the EEO counselor's February 2019 refusal to process his discrimination complaint, the EEO counselor informed Mr. Proctor that she would process his complaint. [JA 10-11, 88, 99].

Mr. Proctor's managers and supervisors were informed of Mr. Proctor's March 12, 2020 contact with EEO representatives. Several days subsequent to his initiating EEO proceedings, Mr. Proctor was confronted by Indian Head Facility managers and was presented with the Settlement Agreement. [JA 113-15]. In an intimidating environment, Mr. Proctor brusquely was told that he needed to sign that document immediately, and that, if he did not do so, DON would immediately implement his demotion and that he would be terminated as recommended in the NOPR. Alternatively, Mr. Proctor was informed that, rather than be terminated, he could

11

elect to retire "voluntarily," provided that he initiated the retirement process "no later than" April 1, 2020 and submitted a "complete and accurate application for retirement by April 15, 2020, with a retirement date effective May 1, 2020." [JA 11, 99, 113-14].

DON made no effort to negotiate with Mr. Proctor and presented him with a "take or leave it" agreement. In the Settlement Agreement, DON gave up nothing of value to secure Mr. Proctor's signature on that document. DON, not Mr. Proctor, benefited from the Settlement Agreement, since, by virtue of the demotion, it would be paying Mr. Proctor, for one month, a significantly lower hourly rate than what he enjoyed prior to his demotion. Mr. Proctor was offered no monetary incentive and the threatened disciplinary action, removal, had not been acted upon in over a year from the March 2019 issuance of the NOPR. Lieutenant Commander Moiles was integrally involved in all steps leading up to and implementing the NOPR and also was the deciding official. There was no valid and legal consideration supporting that Settlement Agreement. [JA 11, 99, 113-14].

Mr. Proctor signed the Settlement Agreement on April 1, 2020. [JA 115]. His assent was not knowing and voluntary. Mr. Proctor's "assent" was procured by duress and the Settlement Agreement was not supported by valuable consideration. No valid, enforceable contract was entered into between Mr. Proctor and the DON. [JA 11, 99-100].

Mr. Proctor's counsel, on April 20, 2020, apprised DON of the fatal deficiencies in the Settlement Agreement. [JA 116-17]. The substantial concerns addressed in that letter were ignored by the DON.

On April 30, 2020, Mr. Proctor retired involuntarily, as dictated by the Settlement Agreement. At that time, DON through its overbearing Settlement Agreement, as well as through its discriminatory and retaliatory actions and the conduct of its managers, had made the working conditions so intolerable that a reasonable worker would have been compelled to resign or retire. [JA 11-12, 100].

Substantially younger and Caucasian co-workers and co-workers that had not engaged in protected activities under Title VII and the ADEA, including but not limited to, Thomas Baldwin, Edward Hayden, Shawn Butler, Kevin Wood and Robert Kraft, were not subjected to discriminatory and retaliatory actions by Michael Murphy (Caucasian, substantially younger than Mr. Proctor), William Bessette (Caucasian, substantially younger than Mr. Proctor). Gary Kendrick (Caucasian), Rebecca Tittle (Caucasian) and Lieutenant Commander William Moiles (Caucasian, substantially younger than Mr. Proctor). [JA 11-12, 100].

On June 11, 2020, Mr. Proctor filed his formal EEO Complaint, charging Lieutenant Commander Moiles with unlawful discrimination and retaliation. [JA 11-12, 100, 118-20]. In that EEO Complaint, Mr. Proctor summarized the facts described above, asserting that, because of his race, age and in reprisal for protected

activities, he had suffered non-selection, reprisal, disparity in disciplinary action, harassment and a constructive discharge.  [JA 100, 118-20].

### D. SUMMARY OF ARGUMENT

This Court should reverse the District Court's holding that the Settlement Agreement was valid.  Rather, that document was void because it was unsupported by consideration.  Mr. Proctor received nothing of value other than that to which he already unquestionably was entitled.  Mr. Proctor's "waiver" of his right to continue to participate in the Agency's disciplinary process (¶6.a of the Settlement Agreement [JA 113]) in no way benefitted him.  That process was a sham, since the same manager that prosecuted Mr. Proctor's removal, Lieutenant Commander Moiles, was, according to the NOPR, to judge his own actions as the deciding official. That "disciplinary process," therefore, was fatally flawed and unreasonable, depriving Mr. Proctor of fundamental due process rights.

Additionally, applying the "totality of circumstances" test, the Court should find that the District Court erred in failing to find that Mr. Proctor's waiver of his claims under Title VII and the ADEA (¶6.h of the Settlement Agreement [JA 114]) was not a knowing and voluntary surrendering of his statutory rights.  The Settlement Agreement was a contract of adhesion, with DON dictating the minute details of Mr. Proctor's "retirement," informing him that, if Mr. Proctor did not "retire" by May 1,

14

2020, he would be deemed to have resigned on that date. The invalidity of the waiver also is buttressed by the lack of consideration supporting an alleged waiver.

The District Court abused its discretion in denying Mr. Proctor's motion for discovery, forcing him into a fencing match without a sword or shield. That finding deprived Mr. Proctor of discovery regarding Lieutenant Commander Moiles' role as the prosecutor and judge of Mr. Proctor's removal. Such discovery was highly relevant to establishing the illusory nature of the asserted "benefit" to Mr. Proctor of continuing to participate in an Agency disciplinary process that was nothing more than a "kangaroo court."

## E.    ARGUMENT

### 1. Standard of Review

This Court reviews *de novo* district court determinations on motions to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *U.S. Methanol, LLC v. CDI Corp.*, 2022 WL 2752365, *3 (4th Cir. July 14, 2022), citing *Benjamin v. Sparks*, 986 F.3d 332, 351 (4th Cir. 2021); *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011). In making its determination, the Court must view all of the evidence in the light most favorable to the nonmoving party, evaluating whether those facts are sufficient "to state a claim to relief that is plausible on its face." *Bonds v. Leavitt*, 629 F.3d at 385. All doubts must be resolved against the moving party. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000); *Adickes v. S. H. Kress & Co.*, 398

U.S. 144, 158-59 (1970); *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 900 (4th Cir.
2017); *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). Contrary
to the District Court's findings in its Memorandum Opinion, Mr. Proctor stated
claims that were plausible on their face that were not barred by the Settlement
Agreement. This Court should dismiss the District Court's order dismissing Mr.
Proctor's Complaint.

**2.** **The District Court Abused its Discretion in Denying Appellant's Motion for Discovery, Resulting in Manifest Injustice.**

In Mr. Proctor's motion for discovery, embedded in his Opposition (ECF 20-1,
Opposition, pp. 10-11), as well as in his motion for discovery (ECF 21) [JA 121-24]
and supporting declaration  (ECF 21- 2) [JA 129-32], Mr. Proctor articulated his
need to obtain discovery probative of the validity of the Settlement Agreement, as
well as his discrimination, retaliation and constructive discharge claims. [JA 129-
32]. The District Court abused its discretion in denying Mr. Proctor's motion for
discovery and that decision should be reversed by this Court.

This Court has cautioned that granting dispositive motions without affording the
opportunity to engage in discovery is akin to requiring the nonmoving party to enter
a fencing match without a sword or mask. *McCray v. Md. Dep't. of Transp.*, 741
F.3d 480, 483-84 (4th Cir. 2014); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
250 n.5 (1986) (summary judgment should not be granted "where the nonmoving
party has not had the opportunity to discover information that is essential to his

opposition."). *Dave & Busters, Inc. v. White Marsh Mall, LLP*, 616 Fed. Appx. 552, 561 (4th Cir. 2015); *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & Cty. Coun. of Balt.*, 721 F.3d 264, 282 (4th Cir. 2013) (en banc) (a request for discovery prior to award of summary judgment is "broadly favored and should be liberally granted").

In denying Appellant's motion for discovery [JA 155-57], the District Court erroneously concluded that discovery was unnecessary to determine the legality of the Settlement Agreement and whether its procurement involved a knowing and voluntary waiver of Mr. Proctor's rights. The District Court ignored the controlling Fourth Circuit authority cited above.

The discovery that was sought by Mr. Proctor in his motion for discovery was directly relevant to Mr. Proctor's argument that the Settlement Agreement was void because it was not supported by adequate consideration. Here, DON contends that the primary "consideration" supporting the Settlement Agreement was Mr. Proctor's agreement in ¶6.a of the Settlement Agreement to forego further participation in the Agency's disciplinary process. That discovery sought, however, would have revealed that such process was a sham, since Lieutenant Commander Moiles, the manager that initiated and prosecuted the NOPR, arrogated to himself the roles of prosecutor and judge, since he also was the deciding official. [JA 27, 129-31].

17

The District Court's denial of Mr. Proctor's motion for discovery eviscerated Mr. Proctor's ability to prove the illusory nature of the "consideration" described in ¶6.a and that the Agency's "disciplinary process" was nothing more than a sham "kangaroo court." It is a classic instance of forcing a plaintiff into a fencing match, without a sword or mask that this Court cautioned against in *McCray v. Md. Dep't. of Transportation*. 741 F.3d at 483-84.

The District Court's denial of  Mr. Proctor's motion for discovery hobbled Mr. Proctor's ability to fully develop evidence sufficient to establish the invalidity of the Settlement Agreement and the insufficiency of the purported waiver of his statutory rights. *Staley v. Gruenberg*, 575 Fed. App'x. 153, 156 (4th Cir. 2014); *Adams v. Trustees of the Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011); *Haywood v. Locke*, 387 Fed. App'x. 355, 359 (4th Cir. 2010); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007); *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004).

The District Court abused its discretion in denying Mr. Proctor's motion for discovery and eviscerated his ability to fully oppose Del Toro's dispositive motion. [JA 155-58].

### 3. **The District Court Erred in Failing to Find that the Settlement Agreement was Void for Inadequacy of Consideration.**

The District Court, Memorandum Opinion, pp. [JA    ] erred in not concluding that the Settlement Agreement was void because it was not supported by adequate

consideration. The waiver of rights and claims contained in the Agreement (Agreement, ¶6(h [JA  ] is invalid, voiding its use as a shield against Mr. Proctor's age and race claims asserted in the Complaint.

In his Complaint, Mr. Proctor alleged that he was the victim of race discrimination and retaliation (Counts I and II) and age discrimination and retaliation (Counts III and IV).  [JA   ]. Contrary to the District Court's findings, Mr. Proctor never waived those claims since the Settlement Agreement never was supported by adequate consideration.

Under the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. §626(f)(1)(D), age-related claims can be released only, *inter alia*, where "the individual waives rights or claims only in exchange *for consideration in addition to anything of value to which the individual already is entitled*." (emphasis added).

While OWBPA defines the legal standard for the validity of releases in ADEA cases,[1] courts, in reviewing waivers raised as defenses to Title VII, Fair Labor

---

[1] While this Court has noted that the development of federal case law under OWBPA has been settled, it has left open the issue of the law to be applied under non-OWBPA cases.  *Kendall v. City of Chesapeake, Va.*, 174 F.3d 437, 441 n.1 (4th Cir. 1999).  "We note that courts can resolve interstitial questions of federal law, and that they must choose between these two courses on a statute-by-statute, issue-by-issue basis," citing *U.S. v. Kimbell Foods, Inc.*, 440 U.S. 715, 727-29 (1979). Under Maryland law, consideration may be established by showing a benefit to the promisor or a detriment to the promisee. *Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.*, 456 Md. 272, 323-24 (2017); *Cheek v. United Healthcare of Mid-Atl., Inc.*, 378 Md. 139, 148 (2003).

Standards Act ("FLSA") and other federal statutory claims, have applied a similar standard for assessing the adequacy of consideration. In such cases, assessing the adequacy of consideration, have noted that the determination turns, not on whether the employee received as much as he might have recovered had he litigated the dispute and won, but rather, whether he received something to which he was not already unquestionably entitled. See *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 374 (5th Cir. 2002); *O'Hare v. Global Natural Resources, Inc.*, 898 F.2d 1015, 1016 (5th Cir. 1990); *Runyan v. NCR Corp.*, 573 F. Supp. 1454, 1460 (S.D. Ohio 1983), aff'd., 787 F.2d 1039, 1041 (6th Cir. 1986), cert. den., 479 U.S. 850 (1986).

Under either standard, the release embodied in ¶6.h. of the Settlement Agreement [JA 114] was not supported by valuable consideration. None of the "benefits" describe in ¶¶6.a. – g. of the Settlement Agreement [JA 113-14] granted Mr. Proctor anything beyond what he already was entitled to:

- Paragraph 6.a – "[Proctor] [a]cknowledges that he could have elected to proceed with the formal disciplinary process rather than electing this alternative." [JA 113]. Mr. Proctor gained nothing from this provision since he already was subject to the NOPR that had lain fallow for a year. Moreover, Mr. Proctor's continued "participation" in the disciplinary process had no value since he already had provided a substantial response to the NOPR that was ignored. Further, the deciding official named in the

20

NOPR, Lt. Commander William Moiles, was the charged party in Mr. Proctor's administrative EEO complaint and, subsequent to Mr. Proctor's immediate supervisor's retirement, took over the processing of Mr. Proctor's disciplinary file. [JA 27, 88-90, 118-20]. The disciplinary process was a clear charade, as the deciding official (Moiles) was the very officer that actively sought Mr. Proctor's removal. There simply was no fair, objective "disciplinary process" in which Mr. Proctor could participate. It was nothing less than a "kangaroo court," with Moiles serving as the prosecutor and judge. Instead, Mr. Proctor was presented with a classic "Hobson's Choice." He could choose to retirement immediately or be terminated as proposed in the NOPR, with Moiles as the prosecutor and judge. [JA 27, 88-90, 118-20]. The Court should find that ¶6.a. accorded no benefit to Mr. Proctor.

- Paragraph 6.b – "[Proctor] [a]grees to accept a Voluntary Change to Lower Grade, to the position of Boiler Plant Equipment Mechanic, WG-5309-10, Step 5; $34.15 per hour, effective Sunday, 29 March 2020. Employee further agrees that no grievance, appeal, or any other complaint in any forum will be filed regarding his Voluntary Change to Lower Grade, or his separation from the Agency." [JA 113] This change lowered Mr. Proctor's

grade and pay (from a GS-11 to a GS-10 position), conferring no benefits on him. [JA 98-99].

- Paragraph 6.c – "[Proctor will] [m]ake contact with a retirement counselor at the Navy Civilian Benefits Center, 1-888-320-2917 and begin the retirement application process no later than April 1, 2020." [JA 113]. This provision conferred no benefit on Mr. Proctor since he was told that, if he did not "voluntarily" retire, he would be terminated, or deemed to have "resigned" on May 1, 2020.  Mr. Proctor also already had vested retirement benefits and ¶6(c) provided no additional benefit to him.

- Paragraph 6.d – "[Proctor will] [f]ully cooperate with and supply all information requested by the retirement counselor and/or documents necessary to process employee's retirement application."  [JA 113].  This provision is nothing more than a directive and a veiled threat to Mr. Proctor that his failure to cooperate with the retirement counselor in processing his "voluntary" retirement paperwork would result an alleged breach of the Settlement Agreement and Mr. Proctor's consequent termination.   No benefit was conferred on Mr. Proctor in ¶6.d.

- Paragraph 6.e – "[Mr. Proctor will] [s]ubmit a complete and accurate application for retirement by April15, 2020. Employee's signature on this agreement is authorization to provide Agency verification that said

verification has been submitted in accordance with the terms of this Agreement." [JA 114]. This provision similarly provided no benefit to Mr. Proctor since it is another veiled threat that he would be considered by the Agency to have breached the Settlement Agreement if a complete and accurate application for retirement was not submitted by April 15, 2020. No benefit accrued to Mr. Proctor from ¶6.e.

- Paragraph 6.f – "[Mr. Proctor will] [e]stablish a retirement date that is effective on or before May 1, 2020 ("the effective date")." [JA 114].  As was true of ¶¶6c. – e, this paragraph provided no benefit to Mr. Proctor, since it demonstrates convincingly that Mr. Proctor was denied the opportunity to even select his retirement date. Rather, it was fixed by the Agency.

- Paragraph 6.g – "[Mr. Proctor will] [r]etire or resign from the Department of the Navy no later than May 1, 2020.  Employee further agrees that this retirement or resignation date is irrevocable and supported by valuable consideration. If employee, for any reason, fails to retire from the Department of the Navy by May 1, 2020, his signature on this document shall service [sic] as his resignation from employment with the Department of the Navy. Employee further agrees that no grievance, appeal, or any other complaint in any forum will be filed regarding his resignation or

retirement from the Agency." [JA 114]. No benefit was conferred on Mr. Proctor by this benefit.  In fact, ¶6.g was a direct threat to Mr. Proctor – retire by May 1, 2020, or you will be deemed to have resigned by virtue of signing the Settlement Agreement.  Mr. Proctor was bluntly informed that, whether by retirement or resignation, Mr. Proctor's employment was to end no later than May 1, 2020.

Paragraphs 6.a – g. [JA 10-11, 113-14] did not confer anything on Mr. Proctor to which he otherwise was not entitled.   As of March 20, 2020, Mr. Proctor had been demoted from his Boiler Plant Supervisor I position, to a Grade 11 position. When he signed the Settlement Agreement on April 1, 2020, Mr. Proctor already had been reduced in status and grade, to Boiler Plant Equipment Mechanic, WG-5402-10, a Grade 10 position. [JA 10-11, 98-99].   The Boiler Plant Equipment Mechanic position described in the Settlement Agreement (Settlement Agreement, ¶6(b) [JA 113]) was a lower-paid, non-supervisory position and the change already had been effected by the Agency. Mr. Proctor had no choice but to accept that change.  The Agency, not Mr. Proctor, benefitted from that illusory "consideration." As described above, Mr. Proctor's agreement to forego participation in the disciplinary process was not a benefit to him since the person charged with unlawful discrimination and retaliation (Lt. Commander Moiles) actively had sought Mr. Proctor's termination and, according to the NOPR, was the deciding official. Mr.

Proctor also had named Moiles as the principal actor in the discriminatory and retaliatory actions taken against him. [JA    27, 88-90, 118-20]. Moreover, the retirement provisions of the Settlement Agreement (¶6(c)-(g) [JA 113-14] similarly were illusory consideration since Mr. Proctor already was eligible for retirement. Those provisions imposed stringent requirements on Mr. Proctor, not the Agency, to be taken before May 1, 2020 to effect Mr. Proctor's retirement. Indeed, had those actions not been taken, according to ¶6.g of the Settlement Agreement, the Agency intended to treat Mr. Proctor as having resigned on May 1, 2020. [JA 114].

Nor is there any evidence that, absent Mr. Proctor's signing the waiver, DON would have effected his removal.  The Agency apparently recognized the frailty of its *March 2019* NOPR, since it remained unacted-upon a year later, in March 2020, when the Settlement Agreement was tendered.  An explanation never was provided for that unnatural delay, inconsistent with the Agency's policies, procedures and practices. This Court should reject the District Court's flawed reasoning and should find that, since the waiver embodied in ¶6.h of the Settlement Agreement [JA 114] was not supported by any valid consideration, it is void and unenforceable as to Mr. Proctor's ADEA and Title VII claims.  29 U.S.C. §626(f)(1)(D); *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 426-28 (1998) ("[T]he statutory command is clear, an employee 'may not waive' an ADEA claim unless the waiver or release satisfies

the OWBPA's requirements."); *Cassiday v. Greenhorne & O'Mara, Inc.*, 220 F. Supp.2d 488, 491 (D. Md. 2002), aff'd., 63 Fed. App'x. 169 (4th Cir. 2003).

**4.** **The District Court Erred in Failing to Find that the Waiver was Not a Knowing and Voluntary Waiver of Mr. Proctor's Claims Under the ADEA and Title VII.**

Apart from the waiver's clear invalidity for inadequacy of consideration, the Settlement Agreement did not effect a knowing and voluntary waiver of Mr. Proctor's ADEA and his Title VII claims. The District Court erred in failing to find that the Settlement Agreement is invalid on that basis as well. "A waiver will not be deemed to have been knowingly and voluntarily executed if the employee otherwise was under duress or was intimidated into signing by the employer." *Cassiday v. Greenhorne & O'Mara, Inc.*, 220 F. Supp.2d at 492. As the Tenth Circuit noted in *Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1229 (10th Cir. 1999), Congress, in passing OWBPA, intended for the courts to scrutinize the "complete circumstances" under which ADEA waivers are signed to look for instances of fraud, duress, intimidation or mistake impacted the employee's waiver of rights. Further, the *Bennett* panel held that it was reversible error where, although the district court correctly found that a release facially complied with the OWBPA elements, it failed to address the totality of the circumstances surrounding the execution of the release to determine whether it was knowing and voluntary. *Bennett v. Coors Brewing Co.*,

189 F.3d at 1229; see *Griffith v. Kraft Gen'l. Foods, Inc.*, 62 F.3d 368, 373-74 (11th Cir. 1995).[2]

Here, Mr. Proctor's execution of the Agreement was not a knowing and voluntary waiver. Most sister circuits have adopted a "totality of circumstances" test for determining whether a waiver of federal rights secured by Title VII and other anti-discrimination statutes is knowing and voluntary.[3] While this Court, in *Cassiday v. Greenhorne & O'Mara, Inc.*, 63 Fed. App'x. at 169, did not explicitly adopt the totality of circumstances test, the Court held that "we conclude that the district court properly determined, based on the totality of circumstances, that Cassiday knowingly and voluntarily waived her rights under Title VII." Id.; see *Melanson v. Browning-Ferris Indus., Inc.*, 281 F.3d at 276 n.4.

---

[2] It also is clear that the invocation of a waiver is an affirmative defense, and that DON, not Mr. Proctor, had the burden of proving that the waiver contained in the Settlement Agreement was valid. *Whitehead v. Okla. Gas & Elec. Co.*, 187 F.3d 1184, 1191 (10th Cir. 1999).

[3] See e.g., *Dorn v. Gen'l. Motors Corp.*, 131 Fed. App'x. 462, 468-69 (6th Cir. 2005); *Cuchara v. Gal-tronics Corp.*, 129 Fed. App'x. 728,730-32 (3rd Cir. 2005); *Smith v. Amedisys, Inc.*, 298 F.3d 434, 441 (5th Cir. 2002); *Melanson v Browning-Ferris Indus., Inc.*, 281 F.3d 272, 276-78 (1st Cir. 2002); *Bennett v. Coors Brewing Co*., 189 F.3d at 1228-29; *Tung v. Texaco, Inc.*, 150 F.3d 206, 208 (2nd Cir. 1998); *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 438-39 (2d Cir. 1998); *Bledsoe v. Palm Bch. Cnty. Soil & Water Conserv. Dist.*, 133 F.3d 816, 819-20 (11th Cir. 1998); *Pierce v. Atchison, Topeka & Santa Fe Ry. Co*., 110 F.3d 431, 437 (7th Cir. 1996); *Warnebold v. Union Pac. R.R. Co.*, 963 F.2d 222, 223 n.2, 224 (8th Cir. 1992).

The knowing and voluntary standard noted approvingly in *Cassiday* involves seven, non-exhaustive factors, which the District Court should have, but failed to apply: (1) the employee's education and business experience; (2) the respective roles of the employer and employee in determining the terms and conditions of the waiver; (3) the clarity of the agreement; (4) the time the employee had to study the agreement; (5) whether the employee had the advice of counsel; (6) whether the employer encouraged the employee to seek the advice of counsel and whether the employee had sufficient time to do so; and (7) the waiver's consideration. *Melanson v. Browning-Ferris Indus., Inc.*, 281 F.3d at 276 n.4.; *Livingston v. Adirondack Beverage Co.,* 141 F.3d at 438-39.

Those factors overwhelmingly demonstrate that Mr. Proctor's "assent" to the Agreement was far from knowing and voluntary. The March 2020 meeting where Mr. Proctor was tendered the Settlement Agreement was very intimidating. There, Mr. Proctor's managers made it clear that Mr. Proctor's signature was expected on April 1, 2020 and that he would no longer work at the Indian Head facility as of May 1, 2020. [JA 11, 99, 114]. Mr. Proctor was directed to retire, effective May 1, 2020. In ¶6.c-g. of the Settlement Agreement, DON even dictated each step that Mr. Proctor had to take in effecting his retirement. [JA 113-14]. DON made it abundantly clear that Mr. Proctor had a "Hobson's Choice" in signing the Settlement Agreement. During the meeting, there was no effort to negotiate with Mr. Proctor.

The Agency's "negotiating" stance was that Mr. Proctor could "take it or leave it." DON provided Mr. Proctor nothing of value in the Settlement Agreement. As stressed in §E.3 above, the "consideration" described in ¶6.a of the Settlement Agreement, Mr. Proctor agreeing to forego further participation in the disciplinary process, was purely illusory, since the deciding official, Lt. Commander Moiles, was the very official that was implementing the removal action, eviscerating any possibility that he would reverse the very decision that he had worked assiduously to implement. [JA 88-90, 118-20].

Other totality of circumstances factors also weigh in Mr. Proctor's favor. At the March 2020 meeting, Mr. Proctor's managers' obtuse discussion of the Settlement Agreement, demanding that Mr. Proctor sign the Settlement Agreement and immediately begin processing his retirement papers, or else, reflects that the Settlement Agreement was little more than a classic "contract of adhesion," supporting a finding that Factor 2 (the respective roles of the employer and employee in determining the terms and conditions of the waiver) weighs in Mr. Proctor's favor. Finally, Factor 7 (the waiver's consideration), as discussed above, also weighs in Mr. Proctor's favor.

DON's principal argument supporting the enforceability of the waiver surrounds the fact that Mr. Proctor had engaged counsel during the brief time that Mr. Proctor was given to consider the Settlement Agreement. The correspondence from Mr.

Proctor's counsel, however, noted only that he represented Mr. Proctor and is silent regarding the Settlement Agreement. [JA 36, 59-60]. Significantly, however, on April 20, 2020, Mr. Proctor's counsel communicated explicitly with the Agency's representative, Kristin Roberts, about the Settlement Agreement's deficiencies. [JA 116-17]. Those concerns were ignored by the Agency.

The totality of circumstances demonstrate clearly that Mr. Proctor was presented with an intimidating "Hobson's Choice" in the Settlement Agreement, depriving him of a meaningful choice. The Court should find that the waiver embodied in the ¶6.h of the Agreement [JA 114] is invalid since it was not a knowing and voluntary waiver of Mr. Proctor's ADEA and Title VII rights *Cassiday v. Greenhorne & O'Mara, Inc.*, 63 Fed. App'x. at 169; see *Dorn v. Gen'l. Motors Corp.*, 131 Fed. App'x. at 468-69; *Cuchara v. Gal-tronics Corp.*, 129 Fed. App'x. at 730-32; *Smith v. Amedisys, Inc.*, 298 F.3d at 441; *Melanson v Browning-Ferris Indus., Inc.*, 281 F.3d at 276-78; *Bennett v. Coors Brewing Co*., 189 F.3d at 1228-29; *Tung v. Texaco, Inc.*, 150 F.3d at 208; *Livingston v. Adirondack Beverage Co.*, 141 F.3d at 438-39.

## F.    **CONCLUSION**

For all the foregoing reasons, Mr. Proctor respectfully requests that the Court

enter an Order reversing the District Court's order denying Mr. Proctor's motion for

discovery and dismissing Mr. Proctor's complaint.

DATED:  AUGUST 17, 2022.

Respectfully submitted,

_____/s/_____
Nathaniel D. Johnson (MD#14729)
Attorney for Appellant
The Employment Law Firm, LLC
3261 Old Washington Road, Suite 2020
Waldorf, Maryland 20602
(301) 645-9103 (Phone)/ndjesquire@gmail.com

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**TERRY PROCTOR,**

*Appellant,*

v.

**CARLOS DEL TORO,**
**Secretary,**
**Department of the Navy,**

*Appellee.*

**CASE NO. 22-1673**

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32

Appellant, by and through his undersigned attorney, pursuant to Fed. R. App. P. 32(a) hereby certifies that Appellant's Opening Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and (7) because this brief has been prepared in proportionally spaced typeface using Word 2016 in 14-point font, Times New Roman type style.  It contains 6,928 words.

DATED:  AUGUST 17, 2022.

Respectfully submitted,

Nathaniel D. Johnson (MD#14729)
Attorney for Appellant

32

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**TERRY PROCTOR,**

      *Appellant,*

    v.

**CARLOS DEL TORO,**
**Secretary,**
**Department of the Navy,**

      *Appellee.*

**CASE NO. 22-1673**

## CERTIFICATE OF SERVICE

This will certify that a copy of the foregoing Appellant's Opening Brief, including the Certificate of Compliance with Fed. R. App. P. 32, was served this 17th day of August 2022 upon the counsel of record named below by electronic transmission through the Court's ECF document filing system:

> Matthew A. Haven, Esq.
> Assistant United States Attorney
> 36 South Charles Street, Fourth Floor
> Baltimore, Maryland 21201

Nathaniel D. Johnson

33